**Jermaine M. WRIGHT, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Nos. 44, 45, 1995.

Supreme Court of Delaware.

Submitted: Nov. 21, 1995.

Decided: Jan. 26, 1996.

---

Joseph M. Bernstein (argued), and Cheryl Rush–Milstead, Wilmington, for Appellant.

Richard E. Fairbanks, Jr.*, Chief of Appeals Division, Department of Justice, Wilmington, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT, and BERGER, Justices, constituting the Court en banc.

WALSH, Justice:

This death penalty appeal is again before this Court following a second penalty hearing. The appellant, Jermaine M. Wright ("Wright"), was convicted of First Degree Murder, Robbery, and related weapons charges arising out of a killing during the

---

* Mr. Fairbanks died shortly following argument in this case. During his long career of public service, Mr. Fairbanks was a dedicated and resourceful appellate advocate who appeared before this Court on many occasions. He combined zealous prosecution with a deep awareness of his duty as an officer of the Court to be fair and impartial. He performed always in the best tradition of the Delaware Bar.

robbery of a tavern on January 14, 1991. Following his conviction of murder in the first degree, a separate penalty hearing was conducted pursuant to 11 *Del.C.* § 4209(b)(1) which resulted in a jury recommendation, by a vote of 12–0, of the death penalty. The Superior Court, after conducting the weighing required by 11 *Del.C.* § 4209(d) imposed a sentence of death by lethal injection. On appeal, this Court affirmed both the conviction and the penalty. *Wright v. State,* Del. Supr., 633 A.2d 329 (1993) ("*Wright I* ").

Upon his return to the Superior Court for the setting of an execution date, Wright filed a motion for postconviction relief pursuant to Superior Court Criminal Rule 61. Although various claims of error were asserted, Wright's principal contention was that his original trial counsel was ineffective in both the guilt phase and the penalty hearing. After conducting an evidentiary hearing followed by extensive briefing, the Superior Court rejected Wright's claim that his trial counsel was ineffective in his representation during the guilt phase of the trial. The Superior Court determined, however, that trial counsel's lack of investigation into Wright's "mental, school and family history" and a lack of strategy in presenting mitigating evidence during the penalty phase of the trial constituted ineffective assistance of counsel under the standard announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Superior Court accordingly vacated Wright's death sentence and ordered a new penalty hearing.

Wright's second penalty hearing took place before a new jury. That jury found, by a vote of 12–0 that two statutory aggravating circumstances existed and further determined, by a vote of 9–3, that the aggravating circumstances outweighed the mitigating circumstances. Thereafter, the Superior Court through written findings concluded that Wright should incur the death penalty. This appeal followed.

## I

In this appeal, Wright claims as error the Superior Court's refusal to find ineffective assistance in trial counsel's strategy in the guilt phase of his original trial. Additionally, Wright claims error in the Superior Court's ruling in the second penalty hearing that permitted the State to introduce evidence that Wright was a drug dealer. Finally, Wright argues that his sentence of death was disproportionate and that, in any event, the 1991 Death Penalty statute under which he was prosecution violated the *ex post facto* clause of the United States Constitution. These contentions will be separately addressed.

## II

Central to an understanding of the trial strategy employed by Wright's original trial counsel is a recital of the evidence which the State was prepared to present at Wright's first trial. That evidence and the background of the charges is entirely set forth in *Wright I.* Essentially, Wright was charged with participating with another person in an armed robbery of the Hi–Way Inn in which a clerk was shot three times, once in the neck and twice in the head. Eyewitness evidence suggested that one of the robbers, answering Wright's description, had returned to the store after the initial robbery and shooting and fired additional shots at the victim. Based on their investigation, the police developed Wright as a suspect and he was arrested. After receiving his *Miranda* warnings, Wright gave an extensive six-hour interview to police in which he discussed other shootings in which he was a suspect. Eventually, Wright gave a videotaped statement concerning the Hi–Way Inn robbery.

In his statement to police, Wright claimed that on the night of the murder Dixon came to him and told him he knew of a place where someone was working alone. They drove to the Hi–Way Inn in a stolen black Volkswagen Jetta. Seifert [the victim] refused to cooperate when they demanded money, and Dixon told Wright to shoot Seifert or he (Dixon) would kill Wright. Wright then shot Seifert once in the back of the head and then fled. Following his videotaped statement, Wright was arrested for the Hi–Way Inn killing and taken to Municipal Court where bail was set on the assault charge and then

to Justice of the Peace Court No. 11 for presentment on the Hi–Way Inn charges.

*Wright I,* 633 A.2d at 332 (footnotes omitted).

Wright was unsuccessful in his effort to suppress his statement to police prior to trial. His counsel, John Willard, Esquire ("Willard"), then proceeded to trial aware that the State had a strong circumstantial case as well as Wright's videotaped statement in which he admitted to being the shooter. To blunt the impact of the confession, Willard determined to portray Wright as a heavy drug user who was under the influence of drugs at the time he gave his statement to police. To counter the suggestion that Wright committed a robbery to support his drug habit, Willard also presented evidence that Wright was a successful drug dealer and thus had no motive to rob. As the trial court acknowledged, Willard was indefatigable in his pretrial investigation and his attempts to locate alibi witnesses for his client.

Willard acknowledged that his portrayal of his client as a drug dealer while helpful in the guilt phase, carried significant risk in the event the jury was asked to recommend the death penalty. Willard discussed this "two edged sword" strategy with Wright as well as his mother and sister. All agreed that it was an acceptable risk. In addition to presenting an alibi for Wright, Willard also sought witnesses to provide an alibi for Dixon, the alleged accomplice. Based on the evidence he secured in his investigation and in view of his client's insistence that he was innocent, Willard presented his "drug dealer/alibi" defense during the guilt phase of the trial. Once the jury rejected this scenario, Willard was left with his depiction of his client as a drug dealer. But as the Superior Court noted in finding that Willard was not ineffective in the guilt phase, "It cannot be said that defense counsel's portrayal of his client as a 'successful drug dealer' is *prima facie* ineffective without viewing the circumstances in which it was presented." The Superior Court determined that Willard made a reasonable strategic decision and rejected the claim of ineffectiveness with respect to the guilt phase.

■ To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy a two-pronged test: (1) that trial counsel's actions fell below an objective standard of reasonableness and (2) there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Skinner v. State,* Del.Supr., 607 A.2d 1170, 1172 (1992). Mere allegations of ineffectiveness will not suffice. A defendant must make specific allegations of actual prejudice and substantiate them. *Younger v. State,* Del.Supr., 580 A.2d 552, 555–56 (1990); Superior Court Criminal Rule 61(b)(2). Moreover, any "review of counsel's representation is subject to a strong presumption that the representation was professionally reasonable." *Flamer v. State,* Del. Supr., 585 A.2d 736, 753 (1990).

■ In rejecting the claim of ineffective assistance of counsel directed to Willard's conduct of the guilt phase of Wright's trial, the Superior Court ruled that defense counsel had pursued a reasonable and understandable strategy. We agree. Counsel was faced with a formidable task in explaining the videotaped confession which was consistent with the circumstantial crime scene evidence. Wright had apparently insisted from the beginning that he was innocent and that his confession was made while under the influence of heroin. Willard fashioned his defense around Wright's heavy drug use and supported his alibi with witnesses. While there was a downside to portraying one's client as a drug user/dealer, such a strategy was clearly a rational one which competent counsel could pursue. With the benefit of hindsight, it might be said that the risks attendant upon such a strategy outweighed the benefits, but as the U.S. Supreme Court has admonished:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

particular act or omission of counsel was unreasonable.

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065.

In its *Strickland* analysis of counsel's effectiveness during the guilt phase the Superior Court did not proceed to the prejudice prong and we find it unnecessary to do so. We note, however, that in view of the impact of the videotaped statement, there is no basis to believe that the State would not have secured a conviction of murder first degree unless that evidence was successfully rebutted or explained. Since the drug user/seller explanation was perhaps the only reasonable explanation for the confession, it is unlikely that the result would have been any different had such an explanation not been presented. In sum, there is no basis to believe the result would have been different as long as the confession was acceptable on its face.

## III

■ Wright's second claim of error is related to his first. He alleges that the Superior Court should have excluded from Wright's second penalty hearing any evidence that Wright was a drug dealer because such evidence was tainted as the product of his former counsel's ineffectiveness. In a motion *in limine* filed prior to the second penalty hearing, Wright sought to preclude the State from offering evidence of Wright's drug dealing that had been disclosed as part of the defense case in the prior guilt phase. The Superior Court denied the motion, ruling that the drug dealer evidence had been appropriately presented in the first trial and was not tainted by a finding of ineffectiveness. Thus, in the second penalty hearing the State, using the same witnesses presented by the defense in the guilt phase of the first trial, sought to portray Wright as a drug dealer, and to have the jury consider this as an aggravating factor in the death penalty determination.

Our affirmance in part II, *supra,* of the Superior Court's rejection of the ineffective assistance of counsel claim also serves to validate the trial court's determination that the drug dealer evidence was not tainted. Thus, the use of such evidence in the prior trial is entirely appropriate in the context presented.[1] Although Wright argues in this appeal that the drug dealer evidence was tainted, his new counsel presented evidence of his drug dealing in the second penalty hearing through a psychologist, Dr. Gerald Cooke, who recounted Wright's extensive drug use.

Wright seeks to invalidate the use of the drug dealer evidence at his second penalty hearing on the theory that such evidence should be "suppressed" because it had its origin in the ineffective conduct of his original counsel. As previously noted, that assertion lacks a valid premise. In any event, the authorities Wright relies upon as support for his suppression theory, *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Commonwealth v. Mangini,* Pa.Supr., 493 Pa. 203, 425 A.2d 734 (1981) and *Commonwealth v. Melson,* 432 Pa.Super. 1, 637 A.2d 633 (1994), all involved the admissibility in a second trial of former testimony on the theory of unavailability of a witness where the previous testimony had been admitted by reason of the ineffectiveness of trial counsel. These confrontation clause cases are clearly inapposite to a situation, as here, in which the initial presentation of the evidence is independently sustainable.

## IV

In *Wright I,* this Court conditioned its mandatory statutory review of the death penalty imposed on the defendant and concluded that the Superior Court did not act arbitrarily or capriciously in its sentencing and that the penalty was proportionate with sentences imposed in Delaware's universe of cases. *Id.* at 342–343. Since the Superior Court granted postconviction relief in the form of a new penalty hearing, it is necessary that we once again engage in our required review of the

---

1. In granting relief under Rule 61 in the form of a new penalty hearing, the Superior Court did not fault Willard's performance in the guilt phase but ruled that his inadequate investigation of Wright's background and lack of a strategy created prejudice in the penalty phase.

death penalty imposed by the Superior Court on February 8, 1995. 11 *Del.C.* § 4209(g)(2).

■ In the second penalty hearing, the jury recommended the imposition of the death penalty by a vote of 9–3. In a 24 page written decision, the Superior Court carefully and completely evaluated the aggravating circumstances, both statutory and non-statutory, and the mitigating circumstances surrounding the offense and the offender.

The Superior Court determined that two statutory aggravating circumstances had been established by the State: (1) that the murder had occurred while the defendant was engaged in the commission of a robbery and (2) that the victim, Phillip Seifert, was more than 62 years of age. The court also concluded that the following non-statutory aggravating circumstances had been shown: (1) the victim was unarmed, (2) the victim was a disabled amputee, (3) the defendant's teenage life had been directed to illegal activity in the form of drug usage and drug dealing, (4) two months previous to this offense, the defendant had shot a young boy in the foot, (5) the defendant's poor disciplinary record while incarcerated (found by the court to be a *"minor"* aggravating factor), and (6) the effect of the victim's death on his family ("not give[n] undue weight").

In assessing mitigation, the sentencing court found the following factors to exist: (1) the defendant's age at the time of the offense (18), (2) the defendant's limited intellectual capacity and immature personality, (3) the defendant's family background, economic circumstances and social milieu (given little weight), (4) defendant's drug addiction—accorded little weight, and (5) the defendant had some potential for rehabilitation.

In weighing the aggravating circumstances against the mitigation circumstances, the sentencing court appeared to find significant the defendant's criminal record which the court described as follows:

Aside from the testimony and arguments outlined above, the defendant's prior criminal record was also entered into evidence during the penalty phase. The record indicates that as a juvenile, the defendant was arrested three times for driving without a license. He reached age 18 on October 11, 1990. Five days after turning 18, the defendant was arrested in the State of New Jersey for possession with intent to distribute dangerous drugs. The Emil Watson shooting occurred on November 15, 1990. On December 3, 1990, he was convicted in the Family Court of resisting arrest and disorderly conduct arising out of separate occurrences which pre-dated his 18th birthday. He was given a suspended sentence to Ferris School. Ten days later, on December 13, 1990, he was convicted in Family Court of resisting arrest, another charge which predates his 18th birthday. He again received a suspended commitment to Ferris School. Phillip Seifert was killed on January 14, 1991. The defendant's criminal record clearly shows that during the three month period defendant was on the street after reaching the age of majority, his life was an evolving pattern of violence.

Expressing its agreement with the majority of the jurors who considered Wright's sentence, the Superior Court concluded that "the aggravating circumstances found to exist in this case outweigh the mitigating circumstances found to exist." The court thereupon imposed a sentence of death by lethal injection.

Wright mounts no specific challenge to the Superior Court's imposition of the death penalty, but asks this Court to reconsider our view expressed in *Wright I* upholding the death penalty. Upon reconsideration, we find no basis to alter our previous view:

Our careful examination of this case and those within the universe of cases reveals that Wright, like others sentenced to death in Delaware, committed an unprovoked, cold-blooded, murder of a person who lacked the ability to defend himself, solely for pecuniary gain. *DeShields v. State,* Del.Supr., 534 A.2d 630, 649 (1987); *Riley v. State,* [Del Supr., 496 A.2d 997, 1027 (1985) ]. As the Superior Court described in its sentencing decision, Philip Seifert's murder was cruel and senseless. We conclude that Wright's sentence of death for the murder of Philip Seifert was propor-

tionate when compared with the sentences imposed in Delaware's universe of cases.

*Wright I,* 633 A.2d at 343.

In reconsidering the universe of cases, we have considered those cases which have gone to a death penalty determination since the 1991 amendment to the capital punishment statute, 11 *Del.C.* § 4209. Those cases, together with cases which have received death penalty determination since *Wright I,* appear as an appendix to this decision.

In sum, we conclude that the death sentence imposed in this case was neither arbitrary nor capricious, and is not comparatively disproportional to the sentences imposed in other First Degree Murder cases which have proceeded to a penalty hearing.

### V

Wright's final claim of error is that the 1991 Death Penalty statute, as applied to the Murder First Degree charge against him, constitutes a violation of the *ex post facto* clause of the United States Constitution. As he concedes, this claim was previously adjudicated, and resolved against him, in *State v. Cohen,* Del.Supr., 604 A.2d 846, 852–855 (1992). We adhere to our previous ruling. The judgment of the Superior Court denying Wright postconviction relief with respect to the guilt phase of his original trial is AFFIRMED. The judgment of the Superior Court imposing a sentence of death is also AFFIRMED.

This matter is remanded to the Superior Court for further proceedings consistent with this opinion, including the setting of a new execution date. This Court's order of February 16, 1995 staying the execution of Jermaine M. Wright's death sentence shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be transmitted forthwith to the attorneys for the parties and to the Commissioner of the Department of Correction.

### APPENDIX

FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS UNDER 11 *DEL.C.* § 4209 AS AMENDED IN 1991 IN 68 DEL.LAWS CH. 189

The following list of cases is a complete restatement of all first degree murder cases decided under 11 *Del.C.* § 4209 as amended in 1991 by 68 Del.Laws Ch. 189, that have gone to a penalty hearing. It incorporates and supersedes the appendices in our decisions in *Lawrie v. State,* Del.Supr., 643 A.2d 1336, 1352–56 (1994); *Ferguson v. State,* Del. Supr., 642 A.2d 772, 792 (1994); *Gattis v. State,* Del.Supr., 637 A.2d 808, 823–24 (1994); *Dawson v. State,* Del.Supr., 637 A.2d 57, 69 (1994); *Sullivan v. State,* Del.Supr., 636 A.2d 931, 953–54 (1994); *Wright v. State,* Del. Supr., 633 A.2d 329, 344 (1993); *Red Dog v. State,* Del.Supr., 616 A.2d 298, 312–15 (1992); *Pennell v. State,* Del.Supr., 604 A.2d 1368, 1378–79 (1992); *Dawson v. State,* Del.Supr., 581 A.2d 1078, 1109–11 (1990).

Cases Decided Under 11 *Del.C.* § 4209

As Amended in 1991 by 68
Del.Laws Ch. 189

| | |
|---|---|
| Case Name: | Meri–Ya C. Baker |
| Case No.: | IN90–12–1039, 1040 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Charles M. Cohen |
| Case No.: | IN90–02–0474 thru 0477 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | David F. Dawson |
| Case No.: | IK86–0024; IK87–01–0841; 0843, 0845 |
| County: | New Castle (venue changed) |
| Sentence: | Death—Postconviction Appeal Pending |

| | |
|---|---|
| Case Name: | Byron S. Dickerson |
| Case No.: | IN90–12–1041, 1042 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Cornelius E. Ferguson |
| Case No.: | IN91–10–0576, 0578 thru 0581 |
| County: | New Castle |
| Sentence: | Death—Postconviction Appeal Pending |

 

Case Name: Robert A. Gattis
Case No.: IN90–05–1017 thru 1019, 1106, 1107
County: New Castle
Sentence: Death—Postconviction Appeal Pending

Case Name: Arthur Govan
Case No.: 92–01–0166
County: New Castle
Sentence: Life Imprisonment

Case Name: Robert W. Jackson, III
Case No.: IN–92–04–1222 thru 1227; IN92–04–1348 and 1349
County: New Castle
Sentence: Death—Automatic Appeal Pending

Case Name: David J. Lawrie
Case No.: IK92–08–0179 thru 0185; IK92–09–0148 and 0149
County: Kent
Sentence: Death—Postconviction Appeal Pending

Case Name: Frank W. Moore, Jr.
Case No.: 92–09–0001, 0002, 1001, 2001, 3001
County: Sussex
Sentence: Life Imprisonment

Case Name: Jack F. Outten
Case No.: IN92–01–1144 and 1145
County: New Castle
Sentence: Death

Case Name: James W. Perez
Case No.: IN93–02–1191 and 1197
County: New Castle
Sentence: Life Imprisonment

Case Name: James Allen Red Dog
Case No.: IN91–02–1495 to 1503
County: New Castle
Sentence: Death

Case Name: Jose Rodriguez
Case No.: IN93–020–1121
County: New Castle
Sentence: Life Imprisonment

Case Name: Reginald N. Sanders
Case No.: IK86–03–0898, 0899 and 0903
County: New Castle (venue changed)
Sentence: Life Imprisonment

Case Name: Nelson W. Shelton
Case No.: IN92–01–1154 and 1155
County: New Castle
Sentence: Death

Case Name: Steven W. Shelton
Case No.: IN92–01–1149 and 1150
County: New Castle
Sentence: Death

Case Name: Donald J. Simmons
Case No.: IN92–01–0770 thru 0772; IN92–01–1140 and 1141
County: New Castle
Sentence: Life Imprisonment

Case Name: Willie G. Sullivan
Case No.: IK–01–0192 thru 0196; IK92–02–0001; IK92–03–0022
County: Kent
Sentence: Death—Postconviction Appeal Pending

Case Name: Charles H. Trowbridge
Case No.: IK91–07–0175; IK91–09–0032 thru 0034
County: Kent
Sentence: Life Imprisonment

Case Name: John E. Watson
Case No.: IN91–09–0020 thru 0025
County: New Castle
Sentence: Life Imprisonment

Case Name: Dwayne Weeks
Case No.: 92–01–0167
County: New Castle
Sentence: Death—Postconviction Appeal Pending

Case Name: Roy R. Williamson
Case No.: S93–05–0249 thru 0255 and S93–05–1249 and 2249
County: Sussex
Sentence: Life Imprisonment

Case Name: James B. Clark, Jr.
Case No.: IN94–06–0543 through 0548
County: New Castle
Sentence: Death—Automatic Appeal Pending

Case Name: Antonio L. Taylor
Case No.: IK94–06–0047 through 0052
County: Kent
Sentence: Life Imprisonment—Appeal Pending